

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| BARBARA ALLAMON, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:10-CV-294-TH |
| | § | |
| ACUITY SPECIALTY PRODUCTS, INC., et al., | § | |
| | § | |
| *Defendants.* | § | |

# <u>MEMORANDUM OPINION</u>

Having granted Defendants' motion for summary judgment [Clerk's Docket No. 93], the

Court now **ENTERS** this Memorandum Opinion explaining the reasons therefor.

### BACKGROUND

On December 3, 1998, Plaintiff Barbara Allamon survived a nearly catastrophic car accident

while traveling in her vehicle in the course and scope of her employment with Zep Manufacturing

Company ("Zep").[1]  At the time of the accident, Allamon was an outside sales representative for Zep.

Her responsibilities included in-person visits with customers and prospects to sell Zep's speciality

chemical and cleaning products.  She began working in this role for Zep in 1998.

As a non-subscriber to Texas's worker's compensation system, Zep was responsible for

directly handling Allamon's injury claim.  The life-threatening injuries Allamon suffered included

a fractured pelvis, a fractured left ankle, and collapsed lungs.  Due to her hospitalization, treatment,

---

[1] Defendant Acuity Specialty Products, Inc. and its predecessors, affiliated companies, parent company, and subsidiaries will be collectively referred to as "Zep" unless a specific company is referenced.

and recovery, Allamon was on leave from Zep from December 3, 1998 through May 2001.  While she was on leave, Zep paid her medical bills and continued paying her salary.

Because of the extent and type of Allamon's injuries and the associated high medical costs, Zep assigned the management of her claims to the risk management department of Acuity Brands, Inc., a related company within the Zep organization.  Keith Purser with Acuity Brands, Inc. was the lead individual responsible for handling Allamon's claims and coordinating her treatment and eventual return to work.  Purser was supervised by Mary Bruce Edmonds who was in charge of Acuity Brands, Inc.'s risk management department.

As a result of her injuries, when she returned to work in 2001 Allamon was unable to drive for work, sit for prolonged periods of time, make in-person sales calls, climb stairs, lift product samples, or make customer service visits.  Essentially, Allamon could not perform the usual duties of an outside sales representative.  To accommodate her return to work, Zep allowed Allamon to work from home and provided her with a headset for her phone, home phone service, and a list of inactive accounts to solicit.  An "inactive account" is an account that has not purchased a Zep product within the preceding six months and one day.  Upon her return to work, Allamon worked approximately ten hours per week and continued to receive health insurance, sick pay, and commissions.  Subsequently, Zep ceased paying her sick pay, and her compensation then included commissions and bonuses.  By the end of February 2003, Zep had paid out more than $450,000 on Allamon's non-subscriber claim.

During 2002, Zep implemented its "Hot Sauce" program.  Hot Sauce was a computer-based system through which Zep sales representatives ("Zep Rep") could access account information for "six month" inactive accounts within their branch.  The information was available via computer or

2

on the Zep Rep's cell phone.  Allamon or any other Zep Rep could look up inactive accounts by entering a zip code or a specific business name, address, or phone number.

Since her return to work in 2001, Allamon had been working as a telemarketing representative, which included receiving lists of inactive accounts from certain branches.  However, the arrangement led to some confusion among branch managers and other Zep Reps.  Therefore, in December 2004, Purser coordinated the drafting of a job description for a telemarketing position like Allamon's.  This document was entitled "Guidelines for Telemarketing Position."[2]  Purser received input from Allamon, Joe Dymecki, and Greg Miller.  Dymecki was Allamon's supervisor at the time of the accident and upon her return to work, and Greg Miller was Allamon's supervisor at the time the Guidelines were drafted.  Upon completing the drafting process, Purser asked Miller to sign off on the Guidelines, and Miller signed them on December 30, 2004.  Purser also asked Ross Harding, an Executive Vice President in the supervisory chain above Allamon and Miller, to sign off on the Guidelines, and he signed them on August 25, 2005.

Edmonds was not directly involved in the development of the Guidelines, but on August 25, 2005, she signed a copy of the Guidelines and added a hand-written note which stated, "Keith – As you work out Barbara's settlement – be sure everyone knows it's based on her continuing to work as a Zep Rep (from home) as long as she's able [and] performance is satisfactory.  This Guideline is a good basis – keep in file."  The version signed by Miller and Harding did not have Edmond's note on it.  Allamon was not asked to and did not sign off on the Guidelines.

---

[2] The record includes two versions of the "Guidelines for Telemarketing Position."  The type-written information is identical on both versions.  One version contains a hand-written note by Mary Bruce Edmonds.  When referring to the common, type-written information, the Court will use the collective term "Guidelines," and when referring specifically to the individual versions, the Court will use either "Guidelines with Edmonds's note" or "Guidelines without Edmonds's note."

Under the Guidelines, Allamon, as a telemarketing representative, was to be assigned accounts from the branches in Dallas, Houston, and Baton Rouge which had not purchased Zep products within the preceding nine months.  These lists of nine month inactive accounts were not to be shared with other Zep Reps.  The Guidelines explained how commissions were to be split if the account required an in-person visit or service call and provided that the account was protected for six months in the same manner an account was protected for six months for other Zep Reps. Allamon was not mentioned by name in the Guidelines.

Also during 2005, Zep and Allamon settled her non-subscriber claim with Zep, and on October 18, 2005, she signed the "Confidential Compromise Settlement Agreement and Full and Final Release" ("Settlement Agreement").  Under the Settlement Agreement, Zep purchased an annuity on Allamon's behalf in the amount of $372,175, which was to compensate her for future medical costs, health insurance, and living costs.  Allamon contends that the Settlement Agreement did not compensate her for future lost wages.  She argues that her actual settlement with Zep comprised two parts:  (1) a "financial" part as evidenced by the Settlement Agreement, and (2) an "employment" part as evidence by the Guidelines, which according to Allamon covered her future lost wages claim.

Throughout the majority of 2005, Zep provided nine month inactive accounts lists to Allamon as set out in the Guidelines.  However, following Hurricane Katrina's landfall, for a period of time Zep did not provide nine month lists from Baton Rouge.  In December 2005, Allamon emailed Purser and Dymecki (who was no longer her manager at this point).  She expressed her concern about not receiving the Baton Rouge nine month lists.  In early 2006, Zep and Allamon agreed that she would receive seven month inactive account lists instead of nine month lists.  By the

4

end of 2006, Allamon was concerned that Zep was not providing her with the proper lists and believed that other Zep Reps were able to access the information on the lists via Hot Sauce. She thought that the Guidelines were not being followed and pursued another amendment to the Guidelines. As a result, in March 2007, Zep began providing Allamon with six month inactive account lists from the branches in Dallas, Houston, and Baton Rouge and also from the San Antonio branch. Prior to receiving these modifications or amendments to the Guidelines, Allamon's sales suffered, but the changes allowed her to increase her sales.

In November 2008, Zep informed Allamon that it was creating the "Central Region Inside Sales Team" ("inside sales team"). The inside sales team would receive lists of six months inactive accounts from the same branches from which Allamon had been receiving six month inactive account lists. The inside sales team was implemented in December 2008. Not surprisingly, the efforts of the inside sales team decreased Allamon's sales. However, Allamon continued working for Zep.

In May 2010, Allamon filed this law suit in Jefferson County, Texas, which Zep removed to this Court on May 24, 2010. Allamon asserts claims for breach of contract and alternatively, implied-in-fact contract; fraudulent inducement; fraud; conspiracy to commit fraud; and negligent misrepresentation. In response to Zep's pleading release as an affirmative defense, Allamon alternatively asserts claims for promissory estoppel, quantum meruit, ratification, agency, reformation, mutual mistake, unilateral mistake, and unjust enrichment. On March 14, 2011, Zep moved for summary judgment on all of Allamon's claims, and the Court heard argument on Zep's motion on July 22, 2011. The Court granted Zep's motion for summary judgment on March 30, 2012 and now enters this memorandum opinion explaining its reasoning.

5

OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Zep objects to Allamon's errata sheet and affidavit submitted with her response.  Zep contends that Allamon's errata was untimely filed under Federal Rule of Civil Procedure 30(e).  Zep argues that Allamon's affidavit should be disregarded as a whole or in part because it is "replete with conclusory, self-serving, unsupported, and contradictory testimony that is inadmissible as evidence. . . ."

## I.     Errata Sheet

Rule 30(e)(1) provides in relevant part:

On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e)(1).

Allamon's deposition occurred on January 21, 2011.  On February 14, 2011, Allamon requested and received a copy of her deposition transcript via email from the court reporter.  *See* CLERK'S DOCKET NO. 67-3 (indicating also that Allamon's counsel received a copy of the transcript via FedEx on February 15, 2011).  On March 9, 2011, the court reporter notified the parties that the deposition was labeled "waived" in error, informed the parties that they would have an additional 30 days to read and sign the deposition and instructed the parties that any Errata sheets were due on April 9, 2011, which was a Saturday.  *See id.* NO. 67-4.  Allamon avers that she was given a one-week extension of the due date for her Errata.  Allamon has not provided any evidence to support

6

such an extension nor cited to any authority indicating that a court reporter may extend the deadline for returning an Errata.  Allamon returned her Errata to the court reporter on April 14, 2011, the same day she filed her response to Zep's motion for summary judgment.  *See id.* NOS. 57 (Response), 72-4.

In an unpublished opinion, the Fifth Circuit stated, "Rule 30(e) does not provide any exceptions to its requirements."  *Reed v. Hernandez*, 114 Fed. App'x 609, 611 (5th Cir. 2004) (per curiam) (unpublished).  At least one court in this district has followed *Reed* in concluding that it would not consider an untimely-filed errata.  *Raytheon Co. v. Indigo Sys. Corp.*, No. 4:07–CV–109, 2009 WL 424773, at *3 (E.D. Tex. Feb. 19, 2009) (Schell, J.) (granting motion to strike untimely Errata based on the Fifth Circuit's statement in *Reed*).  In *Raytheon*, in addition to striking an untimely-filed Errata, Judge Schell also denied the motion to strike an untimely-filed Errata because he found that the opposing party had notice that the Errata would be filed late and offered no objection to the notice.  *Id*.

Allamon contends that Zep will not suffer any prejudice from the Court's consideration of her Errata, even if it is untimely, and, in the alternative, she moves the Court for leave to late file her Errata.  There is no evidence that Zep had notice that Allamon would be filing her Errata after the April 9, 2011 deadline or of any alleged one-week extension of the deadline.  Thus, this case does not present the same exception afforded by Judge Schell in *Raytheon*.  *Id*.  Further, Allamon did not follow the local rules in seeking leave to late file her Errata.  *See* E.D. TEX. LOCAL RULE CV-7(h), (i), (k).  Therefore, the Court will sustain Zep's objection and will not consider Allamon's Errata for purposes of this summary judgment.

## II.    Allamon's Affidavit

Zep objects to Allamon's affidavit as a whole and to specific portions. As grounds for its objections, Zep contends that both Allamon's affidavit as a whole and specific parts contain statements that are conclusory and speculative, are unsupported opinion testimony, offer improper legal conclusions, mischaracterize evidence, and contradict prior sworn testimony. Allamon disagrees.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence." *Healix Infusion Therapy, Inc. V. Helix Health, LLC*, 737 F. Supp. 2d 648, 654 (S.D. Tex. 2010) (citations omitted). "Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citations omitted). "The Court is not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Healix*, 737 F. Supp. 2d at 654 (citations omitted). The admission or exclusion of evidence, including at the summary judgment stage, is within the trial court's discretion. *See Johnson v. Spohn*, 334 Fed. App'x 673, 677 (5th Cir. 2009) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562 (5th Cir. 1998)).

Exercising its discretion, the Court overrules Zep's objections to Allamon's affidavit as a whole and to specific portions. However, in making its decision regarding summary judgment, the Court will only consider proper summary judgment evidence that complies with the rules set out

above.  Any evidence that fails to satisfy such standards, including within Allamon's affidavit, will not be considered.

### BREACH OF CONTRACT

Allamon alleges that Zep breached the Guidelines, which, she contends, is a breach of contract under Texas law.  The elements of a breach of contract in Texas are:  "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."  *Am. Gen. Life Ins. Co. v. Kirsh*, 378 Fed. Appx. 379, 383 (5th Cir. 2010) (quoting *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007)).

For purposes of its motion for summary judgment, Zep admits that the Guidelines constitute an at-will employment agreement between Zep and Allamon.  Summarizing Zep's arguments, it first contends that the Guidelines are an at-will employment contract which can be modified by either party at any time and that it complied with the Guidelines both as originally drafted and as modified. Alternatively, Zep avers that even if the Guidelines were not an at-will agreement, it complied with the Guidelines.

Zep makes two additional alternative arguments, if the Guidelines are not an at-will agreement:  (1) Allamon's law suit falls outside of the limitations period for breach of contract actions; and (2) the Guidelines were extinguished by the Merger Clause in the Settlement Agreement or Allamon's claims were released by the Release Clause in the Settlement Agreement.

Finally, Zep challenges Allamon's claim for breach of implied-in-fact contract.  Zep states that because it has admitted for purposes of the present motion that the Guidelines are an at-will employment agreement, under Texas law there can be no implied-in-fact agreement covering the

9

same subject matter, *i.e.* Allamon's employment with Zep.

Zep's arguments require the Court to first determine what kind of agreement the Guidelines created, and then, should the Court determine the Guidelines are not a terminable-at-will employment contract, the Court must address Zep's alternative contentions.

## I.      Are the Guidelines a Terminable At-Will Employment Agreement?

In Texas, employment is presumed to be at will.  *Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002) (per curiam) (citing *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (hereinafter "*Montgomery County*")).  To modify or alter the at-will employment relationship, "'the employer must unequivocally indicate a definite intent to be bound not to terminate the employee under certain circumstances.'" *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (quoting *Montgomery County*, 965 S.W.2d at 502).  "[A] limitation on at-will employment 'cannot simply be inferred.'" *County of Dallas v. Wiland*, 216 S.W.3d 344, 354 (Tex. 2007) (quoting *Burwell*, 189 S.W.3d at 739). Thus, "without an express agreement to the contrary, employment for an indefinite period may be terminated at-will by either party and without cause."  *Smith v. SCI Mgmt. Corp.*, 29 S.W.3d 264, 266 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 734–35 (Tex. 1985); *Demunbrun v. Gray*, 986 S.W.2d 627, 628 (Tex. App.—El Paso 1998, no pet.)).  However, Texas law recognizes that the at-will status of an employment agreement may be changed in some instances when the employer and employee enter into a "satisfaction contract" which provides for employment so long as the employee's performance is satisfactory. *See Belian v. Tex. A&M Univ. Corpus Christi*, 987 F.Supp.2d 517, 520 (S.D. Tex. 1997) (citations omitted) *aff'd* 132 F.3d 1453; *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 659 (Tex. App.—Dallas

1992, no writ) (citations omitted).

### A.    Which Version of the Guidelines Applies?

As previously discussed, two versions of the Guidelines appear in the record:  a version with Edmond's note and a version without.  The version without Edmonds' note provides only a description of the telemarketing representative's duties, which accounts it will be assigned, and how any commissions will be split between representatives, among other things.  It does not state anything regarding duration or otherwise limit Zep's ability to terminate Allamon's employment. Edmonds' note, according to Allamon, does limit Zep's ability to terminate her, thereby converting her employment from at-will.  Thus, the Court must determine which version of the Guidelines applies, and if it determines that the Edmonds version applies, the Court must determine whether her note is sufficient to take Allamon's employment out of the at-will context.

### 1.    *Parol Evidence Rule*

Zep contends that the Parol Evidence Rule precludes the Court from considering Edmonds's note and Edmonds's and Purser's unexpressed intent that Allamon would be employed under the terms listed in Edmonds's note. CLERK'S DOCKET NO. 69, at 12.  Allamon asserts that Edmonds's note is the only competent evidence of the parties' intent; that statements made by her, Purser, and Edmonds are the only competent testimony of the parties' intent; and that the Guidelines without Edmonds's note do not, on their face, indicate a complete expression of the parties' whole agreement. *Id.* NO. 61, at 29; *id.* NO. 71, at 5.  As evidence that the Guidelines without Edmonds's note are incomplete, Allamon relies on Edmonds's note and the statements made by Edmonds, Purser, and herself.

First, the Court notes that any prior or contemporaneous oral agreements between the parties

are presumed to be merged into the written agreement, even without an express merger clause.

*Rayburn v. Equitable Life Assurance Soc'y of the United States*, 805 F. Supp. 1401, 1407 (S.D. Tex. 1992) (citations omitted); *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 796 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citation omitted) ("A written instrument presumes that all prior agreements relating to the transaction have been merged into it and will be enforced as written and cannot be added to, varied, or contradicted by parol testimony."). In other words,

> When parties reduce an agreement to writing, the law of parol evidence presumes, in the absence of fraud, accident, or mistake, that any prior or contemporaneous oral or written agreements merged into the written agreement and, therefore, that any provisions not set out in the writing were either abandoned before execution of the agreement or, alternatively, were never made and are thus excluded from consideration in interpreting the written agreement.

*DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (op. on reh'g) (citations omitted). Even when the agreement is only partially integrated, parol evidence may only be used to supply consistent additional terms or explain or supplement the terms of the written agreement. *See Jack H. Brown & Co., Inc. v Toys "R" Us, Inc.*, 906 F.2d 169, (5th Cir. 1990) (citing *N.K. Parrish, Inc. v. Sw. Beef Indus. Corp.*, 638 F.2d 1366, 1369 (5th Cir. 1981) *cert. denied* 454 U.S. 1047 (1981); *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32–34 (Tex. 1958); *Don Drum Real Estate Co. v. Hudson*, 465 S.W.2d 409, 413 (Tex. Civ. App.—Dallas 1971, no writ)).

Second, "under Texas law, the parol evidence rule excludes evidence of prior or contemporaneous negotiations and representations that are introduced to vary, add to, or contradict the terms of a valid written instrument, in the absence of fraud, accident or mistake." *Id.* (citation omitted); *see Wright v. Nationwide Mut. Ins. Co.*, No. 6:09-CV-183, 2010 WL 278482, at *4 (E.D.

Tex. Jan. 19, 2010) (Davis, J.) ("'An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.'") (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008)).  The "collateral and consistent" exception, however, does permit parol evidence of prior or contemporaneous agreements that are collateral to and consistent with a binding agreement but that do not vary or contradict the binding agreement's implied or express terms.  *David J. Sacks, P.C.*, 266 S.W.3d at 451) (citation omitted).

Here, the type-written text on both versions of the Guidelines is silent as to duration or termination, thus the type-written text follows the general presumption in Texas of at-will employment.  *See Leathwood v. Engage Energy US, L.P.*, No. 01-99-01481-CV, 2001 WL 665538, at *3 (Tex. App.—Houston [1st Dist.] June 14, 2001, no pet.) (not designated for publication) (citing *Montgomery County*, 965 S.W.2d at 502; *Massey v. Houston Baptist Univ.*, 902 S.W.2d 81, 82 (Tex. App.—Houston [1st Dist.] 1995, writ denied)).  Thus, to the extent the parol evidence Allamon seeks to introduce evinces agreements made prior to or contemporaneous with the type-written text, it directly contradicts the terms of the type-written text and cannot be considered.  *See id.* at *4 (citing *Ross & Sensibaugh v. McLelland*, 262 S.W.2d 205, 208 (Tex. Civ. App.—Fort Worth 1953, writ ref'd n.r.e.); *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520).  Even if the parol evidence rule does not preclude consideration of this evidence, the Guidelines with Edmonds's note are still not the operative version because, as discussed below, no one from Zep with authority to do so approved that version of the Guidelines.[3]

---

[3] The Court recognizes that parol evidence may be used to show that the agreement evidence by the Guidelines was obtained by fraud.  *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citations omitted).  However, because as discussed infra, the Court finds that summary judgment

## 2. *Authority*

Zep argues that none of its employees with authority to enter into employment contracts saw, signed off on, or otherwise agreed to the Edmonds version of the Guidelines.  Zep further avers that because neither Edmonds nor Purser had authority to enter into employment agreements on Zep's behalf, their understanding or intent regarding Allamon's employment cannot bind Zep to the Edmonds version of the Guidelines.  Allamon argues that there is at least a fact question as to whether Edmonds or Purser had authority to enter such agreements.

In Texas, agency is a mixed question of law and fact.  *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 491 F. Supp. 2d 690, 706 (S.D. Tex. 2007) (quoting *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1295-96 (5th Cir. 1994)).  "Nevertheless, if the evidence is undisputed, whether an agency relationship exists is a question of law for the court." *Id.* (citing *Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 677 (N.D. Tex. 1998) (citing *Campbell v. Hamilton*, 632 S.W.2d 633, 634 (Tex. App.—Dallas 1982, writ ref'd n.r.e.)).  "Under Texas law, '[a]gency is never to be presumed; it must be shown affirmatively. The party who asserts the existence of an agency relationship has the burden of proving it.'" *Id.* (quoting *Karl Rove*, 39 F.3d at 1296).

Allamon contends that Edmonds's "deposition demonstrates that she believed that Purser would have been the one to have approved the [G]uidelines and he did not need her approval to do so." CLERK'S DOCKET NO. 61, at p. 30 (citing CLERK'S DOCKET NO. 61-5, at p. 56, ln. 17 – p. 57, ln. 16).  A close reading of Edmonds's deposition indicates that neither she nor Purser had authority

---

must be granted on Allamon's fraud claims, the Court will not consider Allamon's parol evidence.  *See Tiemeyer v. Quality Publ'g, Inc.*, 144 F. Supp. 2d 727, 738-39 (S.D. Tex. 2001) (granting summary judgment on breach of contract and fraud claims and not considering parol evidence despite alleged fraud).

to approve the Guidelines in a manner that would bind Zep.  For example, while discussing why Acuity Brands, Inc.'s risk management department was involved in Allamon's non-subscriber claim, Edmonds testified that Purser had authority (1) to negotiate Zep's behalf and (2) to agree to a financial settlement up to an unspecified amount.  *Id.* No. 61-5, at p. 15, ln. 15 – p. 16, ln. 11. Edmonds further testified that approving the terms of the Guidelines was not her "role" and that such approval was a "Sales Management function."  *Id.* at p. 57, ln. 1 – ln. 2.  Allamon's counsel asked Edmonds, "Did you have to sign off on [the Guidelines] in order for Mr. Purser to then take them to Zep as a *recommendation*?".  *Id.* at p. 57, ln. 11 – ln. 13 (emphasis added).  Edmonds said, "No" and agreed that Purser "had that full authority."  *Id.* at p. 57, ln. 14 – ln. 16.  Later, Edmonds stated that "it wasn't up to [her] to review [the Guidelines], determine [the Guidelines], approve [the Guidelines], anything. [The Guidelines were] worked out between Zep and [Allamon] with [Purser's] *coordination*."  *Id.* at p. 59, ln. 8 – ln. 11 (emphasis added).  Purser also testified in his deposition that he did not have the authority to approve a return-to-work arrangement.  *See id.* No. 61-6, at p.16, ln. 4 – p. 17, ln. 13; p. 19, ln. 15 – ln. 17; p. 112, ln. 7 – ln. 10.

Allamon advances two additional arguments regarding Edmonds's and Purser's authority. Allamon first contends that Edmonds's and Purser's deposition testimony demonstrates their belief that she would be employed under the terms in the Edmonds version of the Guidelines, and that if they did not have the authority to bind Zep to those terms, "then their understanding of Zep's intention has to be based on Zep itself agreeing to the term. . . ."  *Id.* No. 61, at p. 30.  Such an assertion is insufficient to satisfy Allamon's burden to create a fact issue.  *See Tex. Capital Bank, N.A. v. Ameriprise Fin. Servs., Inc.*, No. 3:08-CV-1186-N, 2011 WL 6189494, at *2 (N.D. Tex. May 20, 2011) ("Moreover, '[c]onclusory allegations, speculation, and unsubstantiated assertions' will

not suffice to satisfy the nonmovant's burden.") (quoting *Douglas v. United States Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)).

Allamon next argues that the best evidence of Edmonds's and Purser's authority to bind Zep would be found in an agreement between Zep and its sister company, Acuity Brands, Inc., that employed Edmonds and Purser. Allamon contends that because Zep claims there is no such agreement and that the document Zep produced concerning authority does not mention employment agreements, a fact issue on authority remains.[4] CLERK'S DOCKET NO. 61, at 31. Allamon does not cite any legal authority for this argument. Allamon's assertion is insufficient to satisfy her summary judgment burden. *See id.* at *2. Because none of Allamon's summary judgment evidence or arguments controvert Zep's contention, the Court concludes that whether Edmonds or Purser was an agent with the authority to bind Zep to the Edmonds version of the Guidelines is a question of law. *See In re Enron Corp.*, 491 F. Supp. 2d at 706.

Texas law does not presume agency. *De Francheschi v. BAC Home Loans Servicing, Inc.*, No. 3:09-CV-1667-K, 2011 WL 1456849, at *3 (N.D. Tex. Apr. 14, 2011) (citing *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd [mand. dism'd]); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 22 (Tex. App.—San Antonio 2006, pet. denied)). The burden of proving agency is on the party alleging it. *Id.* (citations omitted). "Absent actual or apparent authority, an agent cannot bind a principle." *Id.* (citations omitted). Thus, the Court turns to the summary judgment record to determine whether Allamon has presented evidence sufficient

---

[4] In her summary judgment evidence, Allamon included a document entitled "DOS Authorization Schedule," which she avers is the document Zep produced to show the extend of any agreement between Zep and Acuity Brands. Although that document includes an entry titled "Written Contracts," which includes a "DOS Authorization Level" of "none," there is no record evidence explaining the document nor indicating to what it pertains. *See* CLERK'S DOCKET NO. 61-37. Therefore, the Court has not considered it for summary judgment purposes.

to raise a fact issue regarding whether Edmonds or Purser was acting as Zep's agent such that Zep was bound by the Edmonds version of the Guidelines.

Actual authority can be express or implied. *DeFrancheschi*, 2011 WL 1456849, at *3 (citations omitted). It "usually denotes the authority a principle 1) intentionally confers upon an agent; 2) intentionally allows the agent to believe he possesses; or 3) by want of due care allows the agent to believe he possesses." *Id.* (citing *Tex. Cityview Care Ctr.*, 227 S.W.3d at 352) (additional citations omitted). "Actual authority is created through conduct of the principal communicated to the agent." *Id.* (citing *Tex. Cityview Care Ctr.*, 227 S.W.3d at 352; *Lifshutz*, 199 S.W.3d at 22).

"Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority." *Id.* (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998); *Tex. Cityview Care Ctr.*, 227 S.W.3d at 353). To determine whether apparent authority exists, courts first look to the acts of the principal to ascertain "whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal." *Id.* (citing *Tex. Cityview Care Ctr.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 22). Only the principal's conduct is considered, and the representations of the agent are of no effect. *Id.* (citations omitted). "[T]he principal must either have affirmatively held the agent out as possessing the authority, or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized manner." *Id.* (citations omitted). "[A] party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, she does so at her own risk." *Id.* (citations omitted); *see Folmar v. Terra Renewal, LLC*, No. H-09-3647, 2011 WL 643229, at *5 (S.D. Tex. Feb. 14, 2011) (same) (citing *Suarez v. Jordan*, 35 S.W.3d 268,

17

272 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.)). *But see Thomas Reg'l Directory Co., Inc. v. Dragon Prods., Ltd.*, 196 S.W.3d 424, 428 (Tex. App.—Beaumont 2006, pet. denied) (stating that a failure to inquire may be evidence that reliance was unreasonable but there is no duty to inquire as an element of apparent authority). "Apparent authority is not available when the other party has notice of the limitations of the agent's power." *Nat'l W. Life Ins. Co. v. Newman*, No. 02-10-00133-CV, 2011 WL 4916436, at *10 (Tex. App.—Fort Worth Oct. 13, 2011, no pet.) (per curiam) (mem. op.) (op. on reh'g) (citing *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 779 (Tex. 1974)); *see also Everest Nat'l Ins. Co. v. LJM Servs., Inc.*, 265 F.3d 1060, 1060 (5th Cir. 2001) (per curiam) (unpublished) (quoting *Douglass*, 504 S.W.2d at 779).

### a.    Actual Authority

There is no record evidence that Zep embued Edmonds or Purser with actual authority to bind it to employment agreements.  Not only is there no evidence that Zep intentionally conferred any such authority on Edmonds or Purser, there is no evidence that either Edmonds or Purser believed they possessed such authority.  *See DeFrancheschi*, 2011 WL 1456849, at *3 (citations omitted). In fact, their deposition testimony makes clear that neither believed they had authority to agree to employment arrangements on Zep's behalf:  both testified that they did not.  Therefore, there is no fact question regarding whether Edmonds or Purser had actual authority to enter into employment agreements on Zep's behalf.

### b.    Apparent Authority

Again, there is no record evidence that Zep held out Edmonds or Purser as having the authority to bind it to an employment agreement.  Edmonds testified in her deposition regarding the

nature of the relationship between Zep and Acuity Brands, Inc.'s risk management department

regarding the handling of Allamon's non-subscriber claim.  She stated,

> Zep, in conjunction with the Acuity Brands Risk Management Department, primarily Keith Purser who joined the company in 2000, managed the claim.
>
> We worked with the – claims people worked with the various doctors, nurses, so forth to help her achieve as much recovery as possible to see to it that medical bills . . . were paid properly, that were billed properly.  All the usual things a claims adjuster would do.
>
> If they had problems or issues, they would come to us.  We would help with that.  They were not well-versed in handling a catastrophe claim of this nature.  They were more accustomed to the standard, everyday Workers' Comp Claim. . . .
>
> So Keith, as our Corporate Expert in claims handling, oversaw and managed the claim primarily.

CLERK'S DOCKET NO. 61-5, at p. 14, ln. 16 – p. 15, ln. 9.

Further, in Edmonds's and Purser's previously detailed deposition statements, both made

clear that they did not have authority to bind Zep to an employment agreement and did not intend

to do so.  There is no evidence that there were "'acts of participation, knowledge, or acquiescence'"

by Zep indicating that Edmonds and Purser had such authority.  *See Reliant Energy Servs., Inc. v*

*Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784 (Tex. App.—Houston [1st Dist.] 2011,

no pet.).  Thus, this is not a case where the putative principal knowingly and voluntarily permitted

the alleged agent to act in an unauthorized manner because Purser and Edmonds did not attempt to

bind Zep to an employment agreement. *See id.* ("Without the principal's participation, either through

its 'acts or knowledge of, and acquiescence in those of the agent,' no mere combination of

circumstances, including acts of the purported agent which may mislead persons into a false

inference of authority, however reasonable, will serve as the predicate for apparent authority.")

19

(quoting *Hall v. F.A. Halamicek Enters., Inc.*, 669 S.W.2d 368, 375 (Tex. App.—Corpus Christi 1984, no writ)).

Additionally, there is no evidence that Allamon did anything to "ascertain both the fact and the scope" of Edmonds's and Purser's authority. *DeFrancheschi*, 2011 WL 1456849, at *3 (citations omitted).  Although Allamon states that she "relied on Edmonds [sic] and Purser's undisputed authority, as representatives of Zep, in negotiating her Settlement Agreement[,]" she does not set forth any evidence of any investigation on her part that led her to reasonably conclude that Zep imbued Edmonds and Purser with contracting authority relating to employment agreements nor the scope of any such authority.  CLERK'S DOCKET NO. 71, at 6.  There is no question that Purser and Edmonds had been involved, to varying degrees since at least 2000, in negotiating the settlement of her non-subscriber claim against Zep, which may have led Allamon to believe they had some level of authority over employment agreements.  However, the undisputed evidence shows that Edmonds and Purser did not believe they had the authority to bind Zep to employment agreements, intended to do so, or that Zep imbued them with such authority.  *See Reliant Energy Servs.*, 336 S.W.3d at 784.

Zep also submitted evidence that Purser indicated to Allamon that he needed to get approval of any employment agreement.  In an email dated March 2, 2005, from Allamon to Purser, Allamon asked in relevant part, "Doesn't the job description say that lists of my accounts are not to be published?"  Purser replied the same day, "That's what I was thinking, but am still trying to get it signed off and agreed to.  In fact, I had a meeting yesterday about your agreement.  It seems like the agreement as written conflicts with the standard Zep rep contract.  Still trying."  CLERK'S DOCKET NO. 43-32.  Allamon does not present any evidence contradicting Purser's implication that he needed

to get the "agreement" "signed off and agreed to."  Thus, there is at least some uncontroverted

evidence that Allamon had notice of the limitations of Purser's authority.  *See Schrum v. Land*, 12

F. Supp. 2d 576, 586 (S.D. Tex. 1997) ("Apparent authority does not apply where the party alleging

the authority has notice of the limitations on the alleged agent's power.") (citing *Douglass*, 504

S.W.2d at 779).   However, even if Edmonds and Purser had authority to bind Zep to the terms

reflected in Edmonds's note, the terms are insufficient to modify Allamon's status as an at-will

employee.

### 3.     *Satisfaction Contract*

Allamon contends that she was employed not at-will but under a satisfaction contract

whereby her employment would continue per the terms in Edmonds's note:  for so long as she was

able and her performance was satisfactory.  Zep argues that the terms are too vague and indefinite

to remove Allamon from the general rule in Texas that employment is at-will.

"In Texas, an employment relationship is at-will unless an employment contract limits 'in

a meaningful and special way' the employer's right to discharge the employee without cause."

*Brown v. Kastle Sys. of Tex. LLC*, No. H-08-02888, 2010 WL 3342219, at *24 (S.D. Tex. Aug. 25,

2010) (quoting *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 577-78 (Tex. App.—Houston [1st Dist.]

1992, no pet.)).  "The employer must unequivocally indicate its intent to be bound not to discharge

the employee except under specified circumstances."  *Id.* (citing *Montgomery County*, 965 S.W.2d

at 502).  "To be enforceable, an agreement to modify the employment-at-will relationship must be

express rather than implied and clear and specific.  *Id.* (citing *Montgomery County*, 965 S.W.2d at

502).

General comments that an employee will not be discharged as long as his work is

> satisfactory do not in themselves manifest such an intent. Neither do statements that an employee will be discharged only for "good reason" or "good cause" when there is no agreement on what those terms encompass. Without such agreement the employee cannot reasonably expect to limit the employer's right to terminate him. An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances.

*Montgomery County*, 965 S.W.2d at 502.

The history of *Montgomery County* provides insight into the Texas Supreme Court's holding. In *Montgomery County*, the state trial court granted summary judgment on all of Brown's claims, including claims of breach of oral and written employment contracts. *Id.* at 501. On appeal, Brown argued that "prior to and during her employment, she was orally promised by the then-administrator that as long as Brown performed her job satisfactorily, Brown would have a job *and* that Brown would not be fired without 'good cause.'" *Brown v. Montgomery County Hosp. Dist.*, 929 S.W.2d 577, 584 (Tex. App.—Beaumont 1996) *rev'd* 965 S.W.2d 501 (Tex. 1998) (emphasis in original). The Beaumont Court of Appeals held that "such representations by the then-administrator who acted as an agent of the Hospital would constitute an oral modification of Brown's at-will status." *Id.* (citing *Morgan v. Jack Brown Cleaners, Inc.*, 764 S.W.2d 825, 826 (Tex. App.—Austin 1989, writ dism'd)). On review and taking the administrator's statements as true, the Texas Supreme Court rejected the Beaumont Court of Appeals's reasoning and held that "[g]eneral statements like those made to Brown simply do not justify the conclusion that the speaker intends by them to make a binding contract of employment." *Montgomery County*, 965 S.W.2d at 502.

To support her argument that the terms created a satisfaction contract, Allamon refers the Court to *Zep Manufacturing Company v. Harthcock*, a case wherein the Dallas Court of Appeals had to determine whether a non-compete agreement was ancillary to an otherwise valid and enforceable

agreement. 824 S.W.2d 654, 658–59 (Tex. App.—Dallas 1992, no writ). In that case, in relevant part, the Dallas Court of Appeals concluded that the employment agreement established a satisfaction contract. *Id.* at 659. In so concluding, the Dallas Court of Appeals relied on the following language from the employment agreement: "If the President of Zep, in his sole discretion, determines that Employee's performance of duties hereunder is unsatisfactory, Employee's employment hereunder may be terminated by written notice from the President of Zep or his designee. . . ." *Id.* at 658.

Citing *Pearson v. Visual Innovations Company, Incorporated*, No. 03-04-00563-CV, 2006 WL 903736 (Tex. App.—Austin Apr. 6, 2006, pet. denied) (mem. op.), Allamon asserts that courts have rejected *Montgomery County's* language when the "satisfaction" language is clearly set forth in a written agreement. In *Pearson*, the Austin Court of Appeals had to determine whether a non-compete agreement was ancillary to an otherwise enforceable agreement. *Id.* at *3–5. Pearson's "Employment Confidentiality Agreement" provided that Pearson would remain employed for six months subject to a termination clause which stated that Pearson's employment could be terminated if he "'failed to perform to the satisfaction of Employer in Employer's sole discretion.'" *Id.* at *4. The Austin Court of Appeals determined that this language was sufficient to remove Pearson from at-will status.[5] *Id.* at *5 (noting also that in cases like Pearson's, courts are evaluating whether an

---

[5] In an unpublished opinion with no precedential value, the Houston Court of Appeals, Fourteenth District, considered whether a written employment agreement was an otherwise enforceable agreement to which a covenant not to compete was ancillary. *Friedman, Clark & Shapiro, Inc. v. Greenberg, Grant & Richards, Inc.*, No. 14-99-01218-CV, 2001 WL 1136169, at *2 (Tex. App.—Houston [14th Dist.] Sept. 27, 2001, pet. denied) (not designated for publication); *see also* TEX. R. APP. P. 47.7 (stating that cases designated "do not publish" before January 1, 2003 have no precedential value). In that case, the employment agreement stated, "The employment of Employee shall continue only so long as services rendered by Employee are satisfactory to Employer, regardless of any other provision contained in this Agreement. Employer shall be the sole judge as to whether such services of Employee are satisfactory." *Id.* at *3. The Houston Court of Appeals, Fourteenth District, held that this language created a satisfaction employment agreement such that the employees were not at-will and the covenant not to compete was ancillary to or part of otherwise enforceable agreements. *Id.* at *3.

employee is at-will in order to determine whether valuable, non-illusory consideration was given for the employee's agreement to not compete).

The *Pearson* court discussed *Montgomery County*, noting that the language in *Montgomery County* required the employer to "'unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances'" before a court can find that the employer intended to make a binding contract of employment. *Id.* (quoting *Montgomery County*, 956 S.W.2d at 502). The *Pearson* court further stated that "[i]n Pearson's case, the circumstances were clearly articulated and set forth in a written, signed contract." *Id.*; *cf. Miksch v. Exxon Corp.*, 979 S.W.2d 700, 704 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (noting that *Montgomery County* leaves open the possibility that an employer's oral statements may modify an at-will employment agreement, and stating that "[t]he critical factor in determining the validity of an agreement to modify at-will status is whether an employer has 'unequivocally indicated a definite intent to be bound not to terminate the employee except under clearly specified circumstances.'") (quoting *Montgomery County*, 956 S.W.2d at 502)).

Outside of the covenant-not-to-compete context, the San Antonio Court of Appeals held that oral assurances by an employer that the employee "would work from year to year, and the contract would be automatically renewed for successive one-year terms, so long as his work was satisfactory" were insufficient to meet the *Montgomery County* standard. *Gilmartin v. KVTV*, 985 S.W.2d 553, (Tex. App.—San Antonio 1998, no pet.). Additionally, in *Palacios v. Ramos*, the San Antonio Court of Appeals once again faced the question of whether oral assurances were sufficient to meet *Montgomery County's* standard. No. 04-04-00780, 2006 WL 332537, at *5–6 (Tex. App.—San Antonio Feb. 15, 2006, no pet.) (mem. op.). In that case, Palacios stated in his affidavit attached to

his summary judgment response that the trust developed between him and his employer "resulted in an understanding between [them] that [he] would be employed for so long as [he] satisfactorily performed [his] duties. . . ." *Id.* at *6.  The *Palacios* court held that this language was insufficient to satisfy the *Montgomery County* standard.  *Id.* at *6.

The Amarillo Court of Appeals was faced with a similar question under a slightly different standard of review in *Welch v. Doss Aviation, Inc.*  987 S.W.2d 215, 220 (Tex. App.—Amarillo 1998, no pet.).  In *Welch*, the trial court granted summary judgment for Doss Aviation, and Welch appealed, asserting among other things, that the trial court erred by not admitting certain statements in Welch's summary judgment affidavit.  *Id.*  Because in Texas the admission or exclusion of evidence is at the trial court's discretion, when the trial court errs in excluding evidence, a Texas court of appeals will only reverse when "the error was calculated to and probably did cause the rendition of an improper judgment." *Id.* (citation omitted).  The Amarillo Court of appeals assumed that the trial court erred by excluding the statements and then considered whether the error was calculated to and probably did cause an improper judgment.  *Id.*

> The statements were as follows:
>
> It was represented to me [Welch] on several occasions, both orally and in writing, that I would be hired for life, as long as I performed my duties in a satisfactory manner.  These representations were made to me by James Campbell, the head man at Doss [Aviation], after I initially started employment with the company.
>
> I was told by Mr. Campbell that the Employee Handbook contained all the employee's [sic] rights and limitations, and to follow it with strict adherence.

*Id.*  The Amarillo Court of Appeals held that any error was harmless because "[n]either of the statements attributed to Campbell do anything to modify the at-will employment relationship." *Id.* The *Welch* court further held that the statements, even when read in conjunction with the employee

handbook's "Termination of Employment" section, still did not satisfy the *Montgomery County* standard. *Id.* at 221. The "Termination of Employment" section listed four reasons Doss Aviation could terminate an employee, the first of which stated that Doss Aviation could terminate for "commission of a criminal act, or of any activity which is deemed detrimental to the best interests of [Doss Aviation]." *Id.* The Amarillo Court of Appeals stated that "[t]his language hardly seems to restrict [Doss Aviation's] right to terminate. Moreover, nowhere in the 'Termination of Employment' section is there clear, definite language restricting such right in a meaningful and special way."[6] *Id.*

The Court finds instructive two other cases decided after *Montgomery County* where oral promises were found specific enough to limit the employer's right to terminate the employee at will. In the more recent of the two, the Houston Court of Appeals, First District, considered whether oral promises to the employee that the employee would not be fired for attempting to bring the employer into compliance with safety laws modified the employee's at-will employment. *El Expreso, Inc. v. Zendejas*, 193 S.W.3d 590, 592, 594–95 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (op. on mot. for reh'g). Zendejas initially served El Expreso, a bus company, as manager of scheduling and charters. *Id.* at 592. After receiving complaints from several drivers that they were being coerced into violating safety regulations, Zendejas relayed his concerns to several higher-ups at El Expreso, including the company's president. *Id.* at 592–93. His concerns were dismissed. *Id.* at 593. He then took his concerns to the regional safety director of El Expreso's parent company. *Id.* She

---

[6] In an unpublished opinion with no precedential value, the Beaumont Court of Appeals held that an oral promise that the employee would be employed "as long as he satisfactorily performed his job" and that he "would only be fired for good cause" were insufficient to satisfy the *Montgomery County* standard. *Dawson Prod. Servs., Inc. v. Sims*, No. 09-97-308-CV, 1999 WL 199634, at *1 (Tex. App.—Beaumont Apr. 1, 1999, no pet.) (per curiam) (not designated for publication).

requested his assistance in bringing El Expreso into compliance with the regulations.  *Id.*  She also reassured Zendejas that he would not be terminated for complying with safety regulations.  *Id.*  She reiterated this assurance on several occasions.  *Id.*  Later, one driver informed Zendejas that another driver had violated the safety regulations, and despite the informant's request to do so, Zendejas did not keep the informant's identity confidential and confronted the alleged violator.  *Id.*  The informant complained to a higher-up that his identity had been revealed, and Zendejas was terminated for revealing the informant's identity, which had allegedly "blown" the safety department's investigation into the violations.  *Id.* at 593–94.

The jury found that El Expreso and Zendejas had an oral contract that he would not be terminated for attempting to ensure that the company complied with safety violations and that he had been fired for doing so.  The Houston Court of Appeals, First District, held that as a matter of law the agreement "was not merely a general comment that Zendejas wold not be terminated as long as his work was satisfactory" but was "unequivocal and definite and showed an intent not to terminate Zendejas if he acted in clearly specified circumstances."  *Id.* at 594–95 (citing *Montgomery County*, 965 S.W.2d at 502); *see also id.* at 596–97 (holding, in a legal and factual sufficiency review, that the regional safety director's comments were sufficient evidence under those standards of review for the jury to have found that a modification of Zendejas's at-will employment existed).

The *Zendejas* court analogized Zendejas's case to one previously decided by the Houston Court of Appeals, Fourteenth District.  *See id.* at 595 (citing *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 701–05 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)).  In *Miksch*, Miksch was a secretary for Exxon.  *Miksch*, 979 S.W.2d at 701.  Her husband wanted to open a Chevron filling station, but Exxon had a written conflicts of interest policy prohibiting an employee or employee's

spouse from competing with Exxon without first obtaining Exxon's approval.  *Id.* at 701–02.

Miksch discussed the situation with her supervisor who told her that her husband's operating the

competing station "'would not be a problem at all.'" *Id.* at 702.  Her husband began operating the

Chevron station, and Miksch received a promotion and a new supervisor.  *Id.*  Later, Exxon revised

its policy, and Miksch's new supervisor informed her that she was in violation of the revised policy.

*Id.*  The supervisor also instructed her that to continue her employment with Exxon, her husband

must relinquish control of the Chevron station.  *Id.*  She and her husband refused, and her

employment was terminated.  *Id.*

Miksch sued Exxon, alleging breach of contract, among other claims.  *Id.*  At the summary

judgment stage, Exxon argued that her breach of contract claim was barred because she was an at-

will employee.  *Id.* at 703.  Miksch agreed that she was an at-will employee but argued that her

original supervisor's statement was sufficient to modify her at-will status.  *Id.*  The trial court entered

summary judgment for Exxon, and Miksch appealed.  *Id.*  The Houston Court of Appeals, Fourteenth

District, stated that unlike the general comments in *Montgomery County*, Miksch's supervisor's

comment did "not contain ambiguous terminology or require one to speculate as to the parameters

of the parties' purported agreement." *Id* at 705.  The *Miksch* court further noted

> The summary judgment proof shows Miksch specifically asked [her supervisor]
> whether her husband's plan to lease and operate the 43rd Street Chevron would
> threaten her position with Exxon. [The supervisor's] response is specific and definite,
> and when viewed in its proper context, communicates the clear message that Miksch
> would not be fired for what ordinarily would have violated Exxon's conflicts policy.
> Accordingly, we cannot conclude that [the supervisor's] statement was, as a matter
> of law, insufficient to modify Miksch's at-will employment status.

*Id.*

From the foregoing cases, the Court concludes that at least within the covenants-not-to-

28

compete context in Texas, an enforceable employment agreement is created by assurances that the employee will not be terminated so long as his performance is satisfactory *as determined solely by either a specific higher-up or by the employer*.  Outside of that context, Texas courts find that the general comment that the employee will be employed so long as her performance is satisfactory does not modify at-will employment, and that to modify such employment, the comments must specifically identify the circumstances under which the employee will not be fired.

Importantly, the *Montgomery County* court addressed language nearly identical to the language before the Court.  965 S.W.2d at 501; *see Brown v. Montgomery County Hosp. Dist.*, 929 S.W.2d at 584 (considering the language in *Montgomery County* under the rubric of "satisfaction contracts").  Following *Montgomery County* and the other cases from outside the covenants-not-to-compete context, the Court concludes that the language before it, that Allamon would have her job "as long as she was able and her performance was satisfactory" does not meet the *Montgomery County* standard.  Therefore, even if the Guidelines with Edmonds's note apply here, the language in Edmonds's note does not change Allamon's employment status from at-will into employment based on a satisfaction contract, even when considered with Edmonds's and Purser's oral assurances.

## II.    Effect of Conclusion that Employment was At-will

Zep argues that because, at most, Allamon's employment agreement was at-will for an indefinite term, it is considered to be performable within one year and thus falls outside the writing requirement of the Statute of Frauds.  Further, Zep contends that because the agreement falls outside of the Statute of Frauds, it can be modified by oral agreement and such agreement can be manifested by the employee's continuing to work after receiving notice of the changes.  Thus, Zep asserts that it did not breach Allamon's at-will agreement by modifying it because she continued working after

29

receiving notice of the modifications.

"[A]n employment contract for an indefinite term is considered performable within a year, placing such agreements outside the writing requirement of the Statute of Frauds. *Welch v. Doss Aviation, Inc.*, 978 S.W.2d 215, 220 (Tex. App.—Amarillo 1998, (no pet.) (citing *Bratcher v. Dozier*, 162 Tex. 319, 346 S.W.2d 795, 796 (Tex. 1961)); *see Abatement, Inc. v. Williams*, 324 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Montgomery County*, 965 S.W.2d at 503)).   The parties may modify, by oral agreement, a written contract that the law does not require be in writing. *Am. Garment Props., Inc. v. CB Richard Ellis-El Paso, L.L.C.*, 155 S.W.3d 431, 435 (Tex. App.—El Paso 2004, no pet.) (citing *Mar-Lan Indus., Inc. v. Nelson*, 635 S.W.2d 853, 855 (Tex. App.—El Paso 1982, no writ)); *see Nacol & Co. v ADT Sec. Servs., Inc.*, No. 4:10–CV–00137, 2011 WL 1542716, at \*7 (S.D. Tex. Apr. 21, 2011) (citing *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1118 (5th Cir. 1984)).   Thus, "[i]n employment at will situations, either party may impose modifications to the employment terms as a condition of continued employment." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986) (citing *L.G. Balfour Co. v. Brown*, 110 S.W.2d 104, 107 (Tex. Civ. App.—Fort Worth 1937, no writ)); *see Lindsey v. DynCorp Intern. LLC*, No. H-09-0700, 2010 WL 376327, at \*4 (S.D. Tex. Jan. 25, 2010).

"[T]he party asserting a change to an at-will employment contract must prove two things: (1) notice of the change, and (2) acceptance of the change." *In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002) (citing *Hathaway*, 711 S.W.2d at 229).   "'[T]o prove notice, an employer asserting a modification must prove that he unequivocally notified the employee of definite changes in employment terms.'" *Id.* (citing *Hathaway*, 711 S.W.2d at 229).   "[W]hen an employer notifies an employee of changes to the at-will employment contract and the employee 'continues working with

knowledge of the changes, he has accepted the changes as a matter of law.'" *Id.* (citing *Hathaway*, 711 S.W.2d at 229).

It is undisputed that Allamon continued working for Zep after the Guidelines were modified. In fact, "Allamon agrees that Zep did not breach [the Guidelines] through the 2006 and 2007 amendments." CLERK'S DOCKET NO. 61, at *33. Instead, Allamon contends that Zep breached the Guidelines in their original form and as amended by (1) providing other Zep Reps "information and lists that were supposed to be exclusively provided to Allamon pursuant to the Guidelines" and (2) failing to provide her the lists to which she was entitled. *Id.* at *34.

Under the Guidelines as originally drafted, Allamon was to receive accounts from the Dallas, Baton Rouge, and Houston branches that had not purchased Zep products for the preceding nine months. The Guidelines further provided that "[t]his list of 9 months accounts is not to be shared with other Zep reps." This "exclusivity" provision remained unchanged following the modifications to the Guidelines. As previously mentioned, Allamon argues that Zep breached this "exclusivity" provision of the Guidelines by providing either "information" or "lists" to other Zep reps. Specifically, Allamon charges that Zep violated the "exclusivity" provision by providing information from her lists to other Zep reps via the "Hot Sauce" program and to the inside sales team, which also received inactive account lists.

In her deposition, Allamon noted that "Hot Sauce" "was a program where you could access inactive accounts." CLERK'S DOCKET NO. 61-2, at *152, ln 2–4. Each Zep rep could access inactive accounts from "whatever the branch was the rep was in." *Id.* at *152, ln 7–8. Allamon acknowledged that "Hot Sauce" had been in effect since 2002. *Id.* at *152, ln 22–24. Despite this testimony, in her affidavit, Allamon avers that Zep was "routinely" breaching the Guidelines by

31

allowing Zep reps to access via "Hot Sauce" the information on her lists. *Id.* No. 61-4. Yet she also states that she had "always known that any Zep Rep can call on any inactive account. . . ."

There is no evidence that Zep provided the lists mentioned in the Guidelines to other Zep reps through the "Hot Sauce" program. The Guidelines' precise wording does not prohibit Zep from providing inactive account information to other Zep Reps, either through "Hot Sauce" or otherwise, so long as it is not providing Allamon's lists to another Zep Rep. Since 2002, Allamon knew that "Hot Sauce" permitted Zep Reps to access inactive account information. The fact that some of the information on her lists was made available via "Hot Sauce" does not constitute a breach of the express language of the Guidelines.

Allamon also contends that Zep breached the Guidelines when it started the inside sales team to which it provided lists of six month inactive accounts. Allamon acknowledges that she continued working for Zep after the inside sales team was implemented, and argues that she repeatedly complained about its receipt of six month inactive account lists. Zep counters that because it provided notice to Allamon that the inside sales team would be receiving all six month inactive accounts, contrary to the exclusivity provision of the Guidelines, and because she continued working for Zep after receiving notice of this modification of the Guidelines, she accepted the modification as a matter of law. Allamon does not argue that she did not receive notice of Zep's intent to assign six month inactive accounts to the inside sales team.

To support its position, Zep cites *Morton v. Kelley*, in which Morton went to work for Kelley believing that she would be provided with health insurance coverage upon beginning work. No. 01-09-00428-CV, 2010 WL 4056516 (Tex. App.—Houston [1st Dist.] Oct. 14, 2010, no pet.) (mem. op.). After not receiving health insurance and sustaining an injury, Morton sued Kelley alleging,

32

among other things, that Kelley breached their oral employment contract by failing to provide health insurance.  *Id.* at *1.   During summary judgment proceedings, Kelley argued that he had not promised to provide health insurance but that he had offered to reimburse Morton for any policy she purchased. *Id.* at *3.  Morton testified in her deposition that Kelley had either offered reimbursement or tasked her with finding a plan for the business.  *Id.* at *4.  The Houston First District Court of Appeals affirmed the summary judgment, holding that because Morton recognized sometime after beginning to work for Kelley that she was not going to be provided with health insurance and yet continued working for Morton, she had notice of the changes to her employment agreement (which the court assumed existed) and by continuing to work after receiving notice, she accepted the changes as a matter of law.  *Id.* at *3-4.  Therefore, the court concluded, there was no breach of contract and summary judgment was appropriate.  *Id.* at *5.

Allamon's allegations regarding the implementation of the inside sales team are similar to Morton's.  Allamon received notice of the changes to the terms of her employment, under which she previously received six month inactive account lists, when she received an email from Tim Masters, a Zep Regional Sales Manager.  That email included a PowerPoint presentation which clearly indicated that the inside sales team would receive all six month inactive accounts. CLERK'S DOCKET NO. 43-24.  Allamon recognized this change to her arrangement under the Guidelines when she forwarded this email to her personal account.  *Id.* No. 43-25.  As the court held *Morton*, this Court concludes that as a matter of law, Allamon accepted the changes to the Guidelines when she continued working for Zep after receiving notice that all six month inactive accounts would be assigned to the inside sales team. *See In re Dillard Dep't Stores, Inc.*, 198 S.W.3d 778, 780-81 (Tex. 2006) (orig. proceeding) (noting that if an employee continues working, even under protest, after

33

receiving notice of the changes, then the employee has accepted those changes as a matter of law); *see also Perkins v. Ulrich*, No. 14-05-00992-CV, 2007 WL 1191903, *3 (Tex. App.—Houston [14th Dist.] Apr. 24, 2007, no pet.) (mem. op.) (same); *L.G. Balfour Co.*, 110 S.W.2d at 107 (same). Therefore, no breach occurred.

Allamon also contends that, at various times, Zep failed to provide her with the lists to which she was entitled under the Guidelines. The only specific time period identified by Allamon was the time following Hurricane Katrina, during which time Zep allegedly did not provide her with lists from the Baton Rouge branch. Hurricane Katrina made landfall in Louisiana in August 2005.

Allamon's Complaint contradicts her allegation of breach following Hurricane Katrina. Allamon states in her complaint that Zep "fully honored the Employment Agreement" in 2005 and 2006. CLERK'S DOCKET NO. 5, at *7. In her briefing, she explains that "fully honored" really only means partially honored. *See, e.g.*, *id.* NO. 61, at *35. To bolster her explanation, she argues that the law does not require knowledge of a breach, at the time of the breach, for such breach to be actionable and that the "fully honored" phrase was used without the aid of discovery. *Id.* NO. 71, at *3–4. The relevant evidence found during discovery is an email that she sent to Dymecki during December 2005. *Id.* NO. 61-29. She does not explain how this email, sent from her personal account, was unavailable at the time she filed her Complaint. Allamon cannot create a fact issue, foreclosed by her Complaint, merely by contradicting her Complaint.

## III.   Implied-in-Fact Contract

Allamon argues in the alternative, that if the Court finds that the parties did not have an express employment contract, then one should be implied. The Court has already determined that the parties had an express, at-will employment contract. Thus, Allamon's alternative claim of

implied-in-fact contract fails as a matter of law. *See Dittman v. D.B. Zwirn & Co., L.P.*, Civil Action No. H–09–402, 2010 WL 519692, at *6 (S.D. Tex. Feb. 8, 2010) ("Texas does not recognize a conflicting implied contract where there is an enforceable express contract between the parties on the same subject.") (citing *Noble Exploration, Inc. v. Nixon Drilling Co., Inc.*, 794 S.W.2d 589, 592 (Tex. App.—Austin 1990, no writ); *Musick v. Pogue*, 330 S.W.2d 696, 699 (Tex. Civ. App.—San Antonio 1959, writ ref. n.r.e.)).

## IV.   Limitations and Release

Zep argues that if the Court finds that the Guidelines constitute an employment agreement that cannot be terminated at-will, then (1) her breach of contract claim was untimely, and (2) the merger language in the Settlement Agreement extinguished such a contract. Having found that the Guidelines are a terminable-at-will employment agreement, the Court does not reach these claims.

## V.   Allamon's Alternative Claims

In her Complaint, Allamon raises several alternative causes of action, stating, "[i]n response to Defendants' pleading release as an affirmative defense, Plaintiff asserts the additional causes of action in the alternative to her causes of action asserted above." CLERK'S DOCKET NO. 5, at *9. Zep avers that these claims fail as a matter of law, and in a footnote, Zep moves the Court for judgment on the pleadings against these claims under Federal Rule of Civil Procedure 12(c). Although Allamon's pleadings on her alternative claims lack substantial detail, the Court denies the motion for judgment on the pleadings and considers her alternative claims on the merits where appropriate.

### A.   Promissory Estoppel

Detrimental reliance is a necessary element of a promissory estoppel claim. *See Hanold v. Raytheon Co.*, 662 F. Supp. 2d 793, 805 (S.D. Tex. 2009) (citing *Vlasek v. Wal-Mart Stores, Inc.*,

Civil Action No. H-07-0386, 2008 WL 2937760, at *10 (S.D. Tex. July 22, 2008) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983))).   "'A promise to provide employment-at-will does not provide a basis for detrimental reliance on continued employment, as a matter of law.'" *Id.* at 805 n.2 (quoting *Vlasek*, 2008 WL 2937760 at *10) (citing *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 608 (Tex. 2002) (additional citations omitted)).   Because Allamon's employment remained at-will, her promissory estoppel claim fails as a matter of law.

### B.    *Quantum Meruit*

"Quantum meruit is an equitable theory which permits a 'right to recover . . . based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 462 (5th Cir. 2003) (quoting *Black Lake Pipe Line v. Union Const. Co., Inc.*, 538 S.W.2d 80, 86 (Tex. 1976)).   "If a valid contract covers the services provided, the party generally cannot recover under a quantum meruit theory." *Purselley v. Lockheed Martin Corp.*, 322 Fed. App'x 399, 403 (5th Cir. 2009) (per curiam) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005)).   The Court has already determined that the parties had a valid, at-will employment agreement, and Allamon does not allege or provide factual support for any work beyond that covered by the Guidelines.   Her *quantum meruit* claim is barred as a matter of law.

### C.    Ratification

In her response to Zep's motion for summary judgment on her ratification claim, Allamon refers the Court to the arguments she made concerning her implied-in-fact contract claim.   She asserts that because the parties performed under the Guidelines, that because her performance has been satisfactory, and that because Zep still has not fired her, then Zep ratified the version of the

Guidelines with Edmonds's note. Contending that her employment was not merely at-will, Allamon asserts:

> If Zep truly believed Allamon's employment was at-will, it most certainly would have already terminated her for insisting on contractual rights it maintains are unavailable to her, filing suit against it[,] and causing it to incur attorneys' fees. The implication of fact is that Allamon does, indeed, have an employment agreement with Zep[,] and it cannot terminate the agreement so long as she is able to perform and does so satisfactorily.

CLERK'S DOCKET NO. 61, at *47.

These unsubstantiated allegations are insufficient to resist a motion for summary judgment. Further, the uncontroverted evidence demonstrates that those with the authority to approve an employment contract and who approved the Guidelines were not made aware of Edmonds's note or the stipulations referenced therein prior to approving the Guidelines. A party must be aware of all the material terms of the contract at the time of ratification. *Verizon Corporate Servs. Corp. v. Kan-Pak Sys., Inc.*, 290 S.W.3d 899, 906 (Tex. App.—Amarillo 2009, no pet.) (citing *T & R Assocs., Inc. v. City of Amarillo*, 688 S.W.2d 622, 630 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.)). Allamon does not allege a time at which the Guidelines with Edmonds's note was ratified other than her unsubstantiated allegations above, nor does she address Zep's evidence that those with authority were unaware of the language in Edmonds's note allegedly limiting Zep's right to terminate Allamon's employment. Her ratification claim fails as a matter of law.

**D.    Agency**

Allamon argues that Purser and Edmonds were Zep's agents in settling her non-subscriber claims. The Court has already determined that neither person had actual or apparent authority to enter into an employment agreement with Allamon on Zep's behalf. Further, the only two Zep

employees with authority to execute such contracts and who signed the Guidelines did so, according to the uncontroverted evidence, without knowledge of Edmonds's note or the terms stated therein. Thus, there is no record evidence to support a claim of agency.

### E.      Reformation, Mutual Mistake, and Unilateral Mistake

All three of these claims rely on the Court finding that Zep's obligations under the Guidelines were released via the Settlement Agreement.  *See* CLERK'S DOCKET NO. 5, at **10–11 (Complaint) Because the Court did not reach Zep's release arguments, these claims are moot.

### F.      Unjust Enrichment

Allamon's unjust enrichment claim is also based on the Court finding that Zep's obligations were released by the Settlement Agreement.   Allamon alleges that if Zep's obligation was extinguished, then Zep will be unjustly enriched by not being responsible for her future lost wages claim, which she asserts was resolved by the Guidelines with Edmonds's note.  Because the Court does not reach Zep's release argument, this claim is moot.  The claim fails for the additional reason that future lost wages are not recoverable damages in the at-will employment context.  *See Polimera v. Chemtex Envtl. Lab., Inc.*, No. 09–10–00361–CV, 2011 WL 2135062, at *5 (Tex. App.—Beaumont May 19, 2011, no pet) (mem. op.) (citing *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 503 n.6 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)); *Town of South Padre Island v. Jacobs*, 736 S.W.2d 134, 138 (Tex. App.—Corpus Christi 1986, writ denied) (citation omitted).

### FRAUD, FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION

Zep also challenges Allamon's causes of action for fraud, fraudulent inducement, and negligent misrepresentation.  Zep first argues that Allamon failed to file her claims within the applicable statutes of limitations.  Zep next contends that Allamon cannot satisfy the elements of

each of these causes of action.  Assuming without deciding that her claims were timely filed, the Court concludes that there is no evidence to support Allamon's claims for fraud, fraudulent inducement, and negligent misrepresentation, and that Allamon's claims for fraudulent inducement and negligent misrepresentation are barred as a matter of law.

In Texas, fraudulent inducement and common-law or "simple" fraud share the same elements.  *Amouri v. Sw. Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex. App.—Texarkana 2000, pet. denied) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990); *Carr v. Christie*, 970 S.W.2d 620, 624 (Tex. App.—Austin 1998, pet. denied)).  To prove these claims, Allamon must show (1) that Zep made a material misrepresentation that was false, (2) that it was either known to be false when made or was made without knowledge of its truth, and (3) that it was intended to be acted on, was relied on, and caused injury.  *Id.* at 168-69 (citations omitted).  Additionally, to prove fraudulent inducement, Allamon must demonstrate that she entered into a binding agreement with Zep based on Zep's false representations.  *See Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001).

To prevail on her negligent misrepresentation claim, Allamon must prove that (1) Zep made the representation in the course of its business, or in a transaction in which it had a pecuniary interest; (2) Zep supplied false information for the guidance of others in their business; (3) Zep did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Allamon suffered pecuniary loss by justifiably relying on the representation.  *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 379 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.24 (Tex. 2002); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999); *Fed. Land Bank Ass'n v.*

39

*Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).  "To establish [her] negligent misrepresentation claim, [Allamon] must also prove that [Zep] misrepresented an existing fact rather than a promise of future conduct.  *Id.* (citations omitted).

## I.      Fraud and Fraudulent Inducement

Allamon's fraud and fraudulent inducement claims are infirm for two reasons:  (1) her fraud claim is really a claim of fraudulent inducement in that Zep allegedly induced her into entering into the Guidelines and because she is an at-will employee, she is barred under Texas law from asserting fraudulent inducement claims; and (2) even if both claims are not properly characterized as fraudulent inducement claims, Allamon has presented no evidence of Zep's lack of intent to perform its promises of future performance, at the time it made them.

Allamon's fraud and fraudulent inducement claims both assert that Zep made material fraudulent misrepresentations intended to induce her to enter into the Guidelines or to modify the Guidelines.  Because her allegations encompass her entering into or modifying the Guidelines, her fraud claim is properly designated as a claim for fraudulent inducement.  *See Hanold*, 662 F. Supp. 2d at 806.  In her complaint and summary judgment briefing, Allamon does not differentiate between her fraud and fraudulent inducement claims, insofar as she argues that Zep's representations induced her into entering into the Guidelines.  Thus, the Court concludes that Allamon's fraud claim is really one of fraudulent inducement.

"An at-will employee's claim for fraudulent inducement is also precluded as a matter of law."  *Cahak v. Rehab Care Group, Inc.*, No. 10-06-00399-CV, 2008 WL 3112083, * (Tex. App.—Waco Aug. 6, 2008, no pet.) (mem. op.) (citing *Miller*,  229 S.W.3d at 381; *Brown v. Swett Crawford of Tex., Inc.*, 178 S.W.3d 373, 379-80 (Tex. App.—Houston [1st Dist.] 2005, no pet.)).  Therefore,

having already concluded that Allamon was an at-will employee and that her fraud claim is properly labeled a fraudulent inducement claim, the Court concludes that Allamon's fraud and fraudulent inducement claims are barred as a matter of law.

Even if Allamon's fraud claim could not be properly considered a fraudulent inducement claim, her fraud claim still fails because Allamon has provided no evidence of Zep's lack of intent to perform future promises at the time it made those promises. *See Miller*, 229 S.W.3d at 381 ("For a promise of future performance to be the basis of actionable fraud, it must have been false at the time it was made.") (citing *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992)).

Allamon argues that "a party's refusal to perform under a contract is some evidence that it did not intend to do so when it entered into the agreement." CLERK'S DOCKET NO. 61, at *49. "Failure to perform a contract, standing alone, is no evidence of the promisor's intent not to perform when the contract was made, but a circumstance to be considered with other facts to establish intent." *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1998); *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 444 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (op. on mot. for reh'g)). Further, "[p]artial performance can negate an intent not to keep a promise at the time it was made." *Id.* (citing *Stewart*, 967 S.W.2d at 445). Even had the Court concluded that Zep breached the Guidelines, there is no question that Zep partially performed under them by providing Allamon with the account lists as required under the Guidelines. Thus had Zep breached the Guidelines, its partial performance negates Allamon's fraud allegation that Zep had no intention to perform under the Guidelines when it entered into them. *See id.*

Allamon also contends that an email sent by one of Zep's executives, Richard Manning, is

some evidence of Zep's present intent to not perform its future promises.   Texas courts have

recognized that a defendant's breach of a contract coupled with "'slight circumstantial evidence' of

fraud" amounts to some evidence of fraudulent intent.   *Aquaplex, Inc.*, 297 S.W.3d at 775 (quoting

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006)).   Manning's email, which

was sent to Purser and Miller on January 13, 2005, states in relevant part:

> What I am curious about is are we vulnerable if Barbara realizes her "list" (which
> commit will only be sent to her) can be obtained by reps from Hot Sauce.  My
> thinking is she is the only person we will supply a "list" to.  However, an enterprising
> new rep with Hot Sauce could get the same info.  I think we're okay as no one else
> will get a "list", [sic] and Barbara will probably never raise a concern about the
> "exclusivity" of her "list". . . . [sic]

CLERK'S DOCKET NO. 61-35.  This email merely reiterates what the Court has already concluded:

a Zep Rep's ability to access through Hot Sauce the information made available to Allamon on her

lists is not a breach of the Guidelines, which required only that she be exclusively provided lists, not

information.  As such, it cannot amount to "slight circumstantial evidence of fraud"—to be coupled

with a breach of a contract—to find fraudulent intent.

## II.      Negligent Misrepresentation

In her summary judgment response, Allamon clarifies the basis of her negligent

misrepresentation claim stating that "it is based on Zep and Harding's representations that at the time

Zep agreed to her non-subscriber Settlement Agreement, it intended to honor the employment part

of that agreement."  *Id.* NO. 61, at *51.  Although this statement more properly aligns with a claim

of fraud, out of an abundance of caution, the Court will consider Allamon's allegation under the

rubric of negligent misrepresentation.  To prevail on her negligent misrepresentation claim, Allamon

must prove, among the above-listed elements, that Zep misrepresented an existing fact, not one of

future performance. *Miksch*, 979 S.W.2d at 706 (citing *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).

As with Allamon's fraud claims, there is no evidence that Zep did not intend to abide by the Guidelines at the time it agreed to them.  Allamon directs the Court to "Defendant's motion and Harding's supporting declaration[,]" but neither of those documents evince an intent to not provide the lists to Allamon as outlined in the Guidelines.  Further, Allamon combines the remainder of her arguments regarding fraud and negligent misrepresentation and asserts essentially that Zep's failure to perform under the Guidelines evinces its intent to not perform at the time it entered into them. Alleged failure to perform does not satisfy the "misrepresentation of an existing fact" element of a negligent misrepresentation claim.  *See Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 805–06 (Tex. App.—Dallas 2011, no pet.).  Thus because Allamon has not presented evidence of Zep's misrepresentation of an existing fact, her negligent misrepresentation claim cannot survive summary judgment.

**SIGNED** this the **26** day of **June, 2012.**

Thad Heartfield
United States District Judge

43